# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| ROCK CREEK PHARMACEUTICALS, INC., | : | Case No. 16-12120 (KG) |
| Debtor(s). | : | |
| In re: | : | Chapter 7 |
| RCP DEVELOPMENT, INC., | : | Case No. 16-12121 (KG) |
| Debtor(s). | : | |
| In re: | : | Chapter 7 |
| STAR TOBACCO, INC., | : | Case No. 16-12123 (KG) |
| Debtor(s). | : | |

**LIMITED OBJECTION BY THE STATES TO THE CHAPTER 7 TRUSTEE'S MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 9014, (I) AUTHROIZING THE SALE OF ESCROW RELEASES FREE AND CLEAR OF ALL LIENS, CLAIMS, AND <u>ENCUMBRANCES</u>**

On December 21, 2018, George Miller, the Chapter 7 Trustee, filed the *Motion of George L. Miller, Chapter 7 Trustee, Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014, (I) Authorizing Sale of Escrow Releases Free and Clear of all Liens, Claims and Encumbrances* ("Motion") (Doc. 45). The States of Alabama, Alaska, Arkansas, Colorado, Idaho, Kentucky, Louisiana, North Carolina, North Dakota, Oregon, Pennsylvania, Tennessee, Utah, Virginia, Washington, and Wisconsin (collectively, "States"), through their undersigned counsel, file this limited objection to the Motion.

1.  Debtor Star Tobacco, Inc. ("STI") was as a cigarette manufacturer. As explained more fully below, to lawfully sell cigarettes in the States, STI was required under state law to establish a "Qualified Escrow Fund" account into which it was obligated to deposit a certain amount per cigarette unit sold in the underlying State. In its Motion, the Trustee seeks to sell rights in a certain sub-set of these Qualified Escrow Fund accounts (referred to in the Motion as "Additional Escrow Accounts"). The States object to the terms of the sale and the proposed Sale Order to the extent that they are inconsistent with the state laws that regulate these escrow accounts.

2.  Specifically, the sale fails (i) to require STI to assume and assign to the Buyer the escrow agreements that govern the Additional Escrow Accounts, (ii) to require the cure of past-due escrow deposits, if any, owed under the assumed escrow agreements, (iii) to specify that the Buyer assumes liability for escrow deposits arising under the assumed escrow agreements, (iv) to adequately specify that the Buyer assumes liability for any Released Claims arising from STI's tobacco operations up to the amount of the Escrow Funds and that STI is not relieved of liability for any Released Claims, (v) to adequately specify that STI has limited rights in the Additional Escrow Accounts and the Buyer takes only those limited rights, and (vi) to specify that the Court does not retain jurisdiction over action by any state with respect to the Buyer's application for permits, licenses, certifications, directory listings, or similar authorizations issued by the state with respect to the manufacture or sale of tobacco products.

3.  Also significant, the Additional Escrow Accounts consist of sub-accounts held for the benefit of the sixteen States named above. Each State regulates its own sub-account and must review the Motion, Asset Purchase Agreement and Proposed Order for compliance with its escrow law. This Motion was filed on December 21, 2018. Because of the intervening holidays and the large number of state regulators impacted by the proposed sale, States have not had sufficient time

to meet and confer with their bankruptcy counsel.

4. Counsel for the States have discussed their objections with counsel for the Chapter 7 Trustee and believe that they can be resolved through changes to the proposed Sale Order. In addition, the Buyer (Xcaliber), very recently purchased Qualified Escrow Fund accounts in another bankruptcy case (*In re Sandia Tobacco Manufacturers, Inc.*, case no 16-12335, in the District of New Mexico) in which state regulators, represented by the undersigned counsel, raised similar objections. All of the state regulatory objections were resolved by the parties through a mutually agreed sale order, which was entered by the bankruptcy court on December 12, 2018.[1] A few days later, the sale closed and the bankruptcy estate was paid the full sale price of $829,744. Counsel for the States believes that similar language can be used to resolve the regulatory objections raised here. To that end, counsel for the States is working on a redline of the proposed Sale Order but has not had sufficient time to consult with the sixteen States, the Buyer, and the Chapter 7 Trustee to resolve these objections before the January 4, 2019 objection deadline and may not have sufficient time to do so before the January 11, 2019, hearing set on this Motion. Therefore, this limited objection is being filed to protect the States' interests.

5. In conjunction with their limited objection, the States also provide a brief explanation of the state laws that regulate STI's Qualified Escrow Fund.

6. STI's manufacture and sale of tobacco products were regulated under the laws of the states in which it sold its cigarettes. Under applicable state law, tobacco product manufacturers fall into two categories: (1) Participating Manufacturers ("PMs"), and (2) Non-Participating Manufacturers ("NPMs"). In November 1998, a group of forty-six states, the District of Columbia, and five U.S. territories ("Settling States") resolved litigation they had brought against the major

---

[1] *In re Sandia Tobacco Manufacturers, Inc.*, case no. 16-12335, (Bankr. D. N.M.) "Stipulated Order on Debtor's Motion to Assume and Assign Escrow Agreement under 11 U.S.C. §365(a) and (f) and Motion Pursuant to 11 U.S.C. §363(f) and (m) to Sell Property Free and Clear of Interests*"* (Doc. 420) entered on December 12, 2018.

U.S. tobacco manufacturers through a landmark agreement known as the Master Settlement Agreement ("MSA"). PMs are those tobacco manufacturers that settled under the MSA and, as required under the agreement, make direct payments every year to the Settling States in recognition of the health care costs imposed by their tobacco products. NPMs are those tobacco manufacturers that did not settle under the MSA and must instead make deposits into an escrow account that are set by statute.

7. Each Settling State passed laws (collectively, "Escrow Statutes") that require NPMs to establish an escrow account, referred to as a Qualified Escrow Fund ("QEF"), into which it must deposit funds in an amount calculated on the basis of their "units sold" (a term defined by each State's Escrow Statute), in the underlying state during the prior calendar year.[2] The escrow deposit rate is adjusted each year for inflation and for sales made in 2017 required about $6.55 per carton.

8. States enacted Escrow Statutes to require NPMs to establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise. The QEF ensures a source of funds to pay a judgment or settlement if a suit is brought by a Settling State, for instance, to recover the health care costs caused by the tobacco products sold by the NPM in that State.

9. An NPM must enter into an escrow arrangement with a federally or state chartered financial institution having no affiliation with any tobacco product manufacturer and having assets of at least one billion dollars ($1,000,000,000) where the arrangement requires that the financial institution hold the escrowed funds' principal for the benefit of releasing parties and prohibits the tobacco product manufacturer placing the funds into escrow from using, accessing, or directing the use of the funds' principal except as consistent with the rest of the Escrow Statute.

---

[2] The Escrow Statutes passed by the Settling States are identical or nearly identical to each other.

10. In addition to using a qualified bank, the NPM must also use an escrow agreement specifically reviewed and approved by each state in which it sells it cigarettes. This escrow agreement implements the requirements of the Escrow Statutes and similarly requires the deposit of escrow for the NPM's cigarette sales. The escrow deposits are held for the benefit of the state in which the cigarettes were sold and must be held for twenty-five years and made available to pay judgments or settlements obtained by the State on certain claims (known as "Released Claims"[3]) arising from the manufacturer's advertising and sale of its cigarettes, including, for example, health care costs related to smoking. Any funds remaining twenty-five years after they were first deposited revert back to the NPM. While the funds remain on deposit, the NPM is entitled to receive the interest or other appreciation on the funds as earned.

11. To be consistent with the Escrow Statutes, the proposed Sale Order must clarify that STI's rights to the funds deposited in the QEF are limited by the Escrow Statutes and the escrow agreement and that the Buyer is only able to receive those same rights currently held by STI and may not acquire greater or different rights. Accordingly, the Buyer receives the QEF account subject to the States' rights to satisfy a Released Claim judgment or settlement obtained against STI or against the Buyer, as its assignee, from the deposits in the account. And like STI, the Buyer may only receive earnings on the account and remaining principal, if any, after a minimum of 25 years from its first deposit.

12. In addition, the sale of all of the Debtor's rights in its Qualified Escrow Fund, even a subset of accounts, requires assumption and assignment of the underlying escrow agreements that govern these accounts. The escrow agreement implements the requirements of the Escrow Statutes and similarly limits the rights of STI in the QEF. The escrow agreement had to be approved by

---

[3] "Released Claims" is defined in the Escrow Statutes by reference to the MSA, which defines them in Section II (n) and (nn).

each of the Settling States in which STI sold its cigarettes before it could be executed by STI, and under the escrow agreement, the States are third-party beneficiaries. Any buyer of the QEF accounts is subject to the same limitations in the escrow agreement as STI and any modification to the escrow agreement must similarly be approved by the affected Settling States.

13. Accordingly, the Buyer takes the Additional Escrow Accounts subject to the same statutory limitations and Escrow Deposit Agreement limitation as the Debtors.

WHEREFORE, the States ask this Court to deny approval of the Motion for the reasons stated above.

                            Respectfully submitted,

                            PATRICIA MOLTENI

                            /s/ electronically filed on 1/4/19
                            Patricia Molteni, (DC Bar No. 980878)
                            *Counsel for the States*

                            National Association of Attorneys General
                            1850 M Street N.W.
                            Washington D.C. 20036
                            202-326-6251
                            pmolteni@naag.org
                            kcordry@naag.org

I CERTIFY that I filed the foregoing electronically with the Court via the CM/ECF system. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing. I certify that I mailed the foregoing by first class mail to the following parties, at the addresses listed below, on January 4, 2019:  none.

/s/ Patricia Molteni